STATEMENT OF CYNTHIA H. DOUGLAS TAKEN IN THE OFFICE OF THE CRIMES AGAINST PERSONS DIVISION BY DETECTIVE ROBERT KUN IN THE PRESENCE OF P.O. FLOYD WILLIAMS, ASSISTANT JACKSON COUNTY PROSECUTOR GEORGE ELY AND CAPTAIN FRANK ETZENHOUSER, ON THIS 26TH DAY OF APRIL, 1978, AT 0320 HOURS.

My name is CYNTHIA H. DOUGLAS. I am 20 years of age having been born April 14, 1958, in Ardmore, Oklahoma. I live at 7331 Tracy with my mother, phone #444-7379. I am employed by Olsten Temporary Employment.

On April 25, 1978, I went to 6934 South Benton with my boy friend, JOHN WALKER, and SHERRI BLACK. We went there to visit LARRY INGRAM. We all sat around and smoked some marijuana and drank some Hennesy Cognac. Sometime between 8:00 PM and 8:30 PM VINCENT BELL and KIM ADKINS came to the door and LARRY let them in. They were only there for a few minutes when KIM pulled out two handguns, one which had a long barrel and another which was a snub-nosed revolver which looked just like the gun that LARRY INGRAM owned. I had seen LARRY's gun laying on the floor earlier but after VINCENT and KIM got there I didn't see LARRY's gun any more so I assumed that KIM had picked up LARRY's gun. LARRY asked him what he wanted and KIM stated, "You know what I want, man" and then VINCENT went to the door and opened the door and let some more people into the house and a black dude with a shotgun and a dude who had a brown paper sack over his head came into the bedroom where we had been sitting, watching TV. Either VINCENT or the dude with the shotgun threw me a cloth rope and told me to tie up my boy friend, JOHN WALKER. I tied up JOHN's hands with his hands behind his back. I sat back in the corner with SHERRI behind the door and someone tied SHERRI and I up together but I don't know what they tied us with. Before this happened LARRY had gone into the living room to look for VINCENT and I heard someone say, "Tie him up" and I assumed that LARRY had been tied up in the living room. I had my head down and wasn't looking up and I heard these people searching through the house and they were in the house for approximately twenty minutes to a half hour, searching. I heard them arguing with LARRY and it sounded like they were beating on him and I heard them ask Larry something about the $300.00 and then a short time later I heard one gunshot come from the living room and then they came into the bedroom and they shot JOHN and then they shot SHERRI and I think they shot SHERRI twice and I heard the gun click a couple of times and I guess they must have thought they shot me too because then they left the house. I waited for a while and raised my head up and when I realized they were gone I got myself loose and left the house and ran down the street to get some help.

Q. CYNTHIA, did anyone make any verbal threats or demands against you?
A. Yes, a couple of times VINCENT BELL told me that I had better not tell and he told me this as I was tying up JOHN WALKER.

[handwritten: She said the man with the shotgun at first and now nothing about]

Q. CYNTHIA, do you know who the man was who was carrying the shotgun?
A. _____ No.

Q. CYNTHIA, did this man that had the paper sack over his head do anythin
(Continued on Page Two)

or say anything that would help you recognize him?
A. No. The only thing I know about him is that he was tall.

Q. CYNTHIA, how long have you known VINCENT BELL and KIM ADKINS?
A. I have known VINCENT for about five years and I have known KIM for about six months to a year. I know VINCENT because my sister used to go with VINCENT's brother, JESSE BELL. I know KIM's sister, GWEN ADKINS, quite well.

Q. CYNTHIA, to the best of your knowledge was there any other narcotics in the house besides the marijuana you were smoking?
A. No, not to my knowledge.

Q. CYNTHIA, have you ever seen any narcotics other than marijuana at that house?
A. No.

Q. CYNTHIA, to the best of your knowledge was LARRY INGRAM or anyone else living at that house involved in the sale of narcotics?
A. I don't know.

Q. CYNTHIA, I show you this Kansas City, Missouri Police Department mug shot #134789, dated 1-16-76, can you identify this person?
A. Yes. That is the person I know as VINCENT BELL.

Q. CYNTHIA, I show you a Kansas City, Missouri, Police Department mug shot #144545, dated 4-7-78, and ask you if you can identify this person?
A. Yes, this is the person I know as KIM ADKINS.

Q. CYNTHIA, is there anything else you wish to add to this statement?
A. No.

I have read the above statement. I understand it and I am signing it because it is the truth.

SIGNED _Cynthia N Douglas_

WITNESSES _____

_____

_____

_____ rep

EX. "A" 2 of 2 pgs.

KANSAS CITY MISSOURI POLICE DEPARTMENT COMPLAINT # Sup. L-2838

| DATE OF REPORT | OFFICERS | UNIT OR STATION | CHARACTER OF CASE |
|---|---|---|---|
| 4-26-78 | Det. Richard Zoufek<br>Det. W. Schweitzer | C. A. Persons | Progressive Investigation<br>Homicides and Agg. Assault |

TITLE OF CASE (INCLUDE ALIASES)
#1 LARRY E. INGRAM, N/M, 6-17-56, LKA 3002 Campbell, Jkt. 135917
#2 SHERRIE BLACK, N/F, 4-7-56, 1140 E. 75th Terrace
#3 JOHN S. WALKER, JR., N/M, 6-22-57, 2204 E. 74th Street

DETAILS (REPORT ALL FACTS IN LOGICAL SEQUENCE)
#4 CYNTHIA H. DOUGLAS, N/F, 4-14-58, 7331 Tracy, 444-7379

OCCURRED: 4-25-78, approximately 2110 hours, at 6934 S. Benton

SUSPECTS: #1 KILM ADKINS, N/M, 9-24-58, 5928 Kensington

#2 VINCENT BELL, N/M, 5-14-57, 1140 E. 65th Street

#3 KEVIN B. STRICKLAND, N/M, 6-17-59, 5540 Jackson (in custody)

INTERVIEWS: VENESSA (COOKIE) DOUGLAS, N/F, 2-11-56, 7309 Agnes, 363-2529

On 4-26-78 reporting officers were assigned by Sgt. William Linhart to re-interview the above listed #4 victim, CYNTHIA DOUGLAS, and to transport her to the Crimes Against Persons Division for the purpose of viewing a lineup in an attempt to identify one of the possible suspects in the above listed homicides.

At 1530 hours reporting officers responded to 7331 Tracy and contacted CYNTHIA (CINDY) DOUGLAS and transported her to 1125 Locust. At this time reporting officers, in the presence of Police Commissioner Gwendolyn Well and Detective R. Kun, CINDY was re-interviewed in regard to the events leading up to the homicides.

CINDY basically related the same information as given in her statement to Det. Kun earlier this date, and expanded on the events that occurred this offense as follows. CINDY stated that she, her boy friend, JOHN W. and SHERRIE BLACK drove over to LARRY INGRAM'S house, 6934 South Benton, arrived there around 6:45 to 7:00 p.m. She stated that JOHN drove a brown Mustang and parked the car in front of 6934 South Benton. She stated that this car belonged to a party by the name of PAT HORNSBERGER and was just borrowed by JOHN. CINDY went on to relate that when they arrived at the house LARRY INGRAM'S brother, whose name she does not know, was also there. She stated that LARRY'S brother, who appeared older than LARRY, stayed for about five minutes and then left. CINDY stated that she, JOHN, SHERRI and LARRY then went into the bedroom and watched television, smoked some weed, and drank some cognac. She stated after they were there a short while, LARRY gave JOHN five dollars to go out and get some more cognac, which he did. She stated upon JOHN'S return, they all remained in the bedroom, smoking and drinking, until somewhere around 8:15 to 8:30 when there was a knock on the front door. CINDY stated she is fairly sure of the time as the television program, Three is Company, was on and was about half over. She stated that LARRY got up to go to the front door, but before doing so, he picked up what she believed to be a short-barreled, dark-colored .38 caliber revolver, which was lying on the floor, and stated that short

after this LARRY came back into the bedroom followed by two Negro males
she knows as KIM ADKINS and VINCENT BELL. She has known KIM for a numbe
years and met VINCENT BELL through him, however she was unable to say ho
long she had known BELL. She stated that as LARRY re-entered the bedroo
placed his revolver on the television set and walked over to the bed and
down as if nothing was wrong. She stated that just seconds after ADKINS
BELL entered the bedroom, ADKINS produced two handguns, one which she be
to have been the gun belonging to LARRY which had been placed on the tel
LARRY then asked KIM what he wanted and KIM made a statement similar to '
know what I want, man, let's have it." She stated that LARRY denied know
what KIM was referring to. She stated that at this time, while KIM rema
in the bedroom with the guns, VINCENT left the bedroom and apparently wer
to the front door. In a few moments, VINCENT came back and he was follow
into the bedroom by a Negro male with a paper sack over his head and anot
Negro male who, she stated, was carrying a short-barreled, pump-type shotg
She stated that this Negro male was wearing a patch-work type leather coa
She stated that this Negro male told her numerous times, "Don't look at m
don't look at me," and she was able to catch a glimpse of him and recogni
him to be a party that she knows as NARDY. It should be noted at this ti
that CINDY stated that due to her extreme emotional condition, having bee
shot, and having smoked some marijuana and consumed some cognac, she was
unable to recall this particular suspect's name during her previous inter
with detectives earlier this date. She stated that throughout the mornin
and afternoon hours this date, she was able to go over the events in her
and clarify certain things.

    CINDY went on to relate that after the four suspects were in the bed
room, she was thrown a piece of cloth-type rope and was told to tie the h
of JOHN WALKER, which she did. She stated that during this time VINCENT
left the bedroom and was followed by LARRY INGRAM who continued calling o
VINCENT'S name. She stated at this time she was forced to sit next to SH
BLACK against the wall and one of the other suspects, unknown which one,
left the room. She stated that she could hear sounds of a scuffle coming
the front room area and then heard someone say, "Tie him up," which she t
was meant to mean LARRY was being tied up. She stated that while this wa
going on, she and SHERRI were tied together by their hands and were told
keep looking down. CINDY went on to relate that after about 20 or 30 min
she heard a little pop sound come from the living room, which she assumed
be a gunshot. She stated that almost immediately after hearing this pop,
heard another little pop and assumed that is when they shot JOHN. She st
she then heard a third pop similar to the other two, and she felt SHERRI
and she, CINDY, slumped at the same time, giving the indication that she
been shot. She stated that it was at this time that she glanced up sligh
and could see the lower legs of someone standing a few feet from her towa
the center of the bedroom. At this time someone left the room and a few
moments later someone returned, and as she can best recall, she heard what
sounded like the slide of a shotgun loading a shell in the chamber and al
immediately there was a shotgun blast fired which struck SHERRI, and that
few pellets struck her in the right leg. She figured that whoever was doi
the shooting thought they had killed her, too, because she was covered by
blood that splattered when SHERRI was shot. She then states that she thir
she heard gun actions, but is not quite sure, but at any rate she heard th
subjects leave the house and waited for a while until she was sure they we
gone and she freed herself and left the house to try and get help.

KANSAS CITY MISSOURI POLICE DEPARTMENT
CONTINUATION REPORT

DATE 4-26-78   CASE # Sup. L-283

Page 3

At this time CINDY related to the reporting officers that this morning, 4-26-78, sometime between the hours of 10:00 a.m. and noon, she was advised by her sister, VENESSA (COOKIE) DOUGLAS, that she, COOKIE, had received information from MARQUIS HARRIS, COOKIE'S boy friend, described as a Negro male, 21 years of age, living in the vicinity of 58th Street and Terrace, telephone 523-1364. COOKIE reportedly told her that sometime early this morning MARQUIS received a phone call from NARDY STRICKLAND requesting that MARQUIS get hold of CINDY and tell her to be quiet, at which time she would receive an undetermined amount of money. She further related that NARDY reportedly asked MARQUIS to keep him informed of what was going on and to advise him if he had knowledge of police looking for him. CINDY also stated that COOKIE related to her that the information she had from MARQUIS was that VINCENT BELL and NARDY went over to MARQUIS'S house on 4-25-78 and contacted MARQUIS'S father in regard to borrowing a shotgun. COOKIE reportedly told CINDY that MARQUIS'S father told them, "Whatever you're getting ready to do, don't do it," and refused to loan them a shotgun.

At 1800 hours this date a showup was conducted on the second floor of Police Headquarters and CINDY DOUGLAS positively identified KEVIN BERNARD STRICKLAND as the suspect with the shotgun. A signed statement was taken. For details, see Form 100 by Detectives Barton and Hanton.

At approximately 1930 hours, reporting officers transported CINDY DOUGLAS back to her residence at which time contact was made with the above listed interviewed, COOKIE DOUGLAS. COOKIE related basically the same information as related by CINDY, however she stated she was informed by MARQUIS that he, MARQUIS, had been with NARDY at approximately 8:00 a.m. this morning, and that MARQUIS had reportedly dropped NARDY off at 57th and Swope Parkway. NARDY also reportedly told Marquis that the other three suspects had not left town and were in the area nearby, however did not give any locations. Reporting officers were informed by COOKIE that MARQUIS would be willing to talk with the police, but attempts to contact him at this time met with negative results, and further attempts will be made on 4-27-78.

Investigation to continue.

Det. Richard Zoulek
Det. William Schweitzer

raf

EX. "B"
3 oF 3 PAGES


Approved: Major Robert Jenkins, Commanding, C. A. Persons Division

# KANSAS CITY MISSOURI POLICE DEPARTMENT

COMPLAINT # Sup. L-28387

| DATE OF REPORT | OFFICERS | UNIT OR STATION | CHARACTER OF CASE |
|---|---|---|---|
| 4-26-78 | Det. D. Barton<br>Det. D. Hanton | C. A. Persons | Progressive Investigation<br>Homicides & Agg. Assault |

#1 LARRY E. INGRAM, N/M, 6-17-56, LKA 3002 Campbell, Jkt. 135917
#2 SHERRIE BLACK, N/F, 4-7-56, 1140 E. 75th Terrace
#3 JOHN S. WALKER, JR., N/M, 6-22-57, 2204 E. 74th Street
#4 CYNTHIA H. DOUGLAS, N/F, 4-14-58, 7331 Tracy, 444-7379

DETAILS (REPORT ALL FACTS IN LOGICAL SEQUENCE)

OCCURRED: 4-25-78, 2120 hours at 6934 South Benton

SUSPECTS: #1 KILM ADKINS, N/M, 9-24-58, 5928 Kensington

#2 VINCENT BELL, N/M, 5-14-56, 5520 Jackson

POSSIBLE SUSPECT: #3 KEVIN B. STRICKLAND, N/M, 6-7-59, 5540 Jackson (in custody)

On 4-26-78 at 0955 hours reporting officer was contacted by Officer Chambers, car 274, and Sgt. D. Miller, car 270, who had the number three suspect in custody. Officer Chambers stated that the party, STRICKLAND, uses the name "NORDY" and is a close associate of the #1 and #2 suspects. A pickup had been issued for "NORDY" on 4-26-78 by Officer Russell and Det. C. Luther.

The subject STRICKLAND was taken to an interview room where he was advised of his rights via the Miranda Warning and he read and refused to sign PD Form 340, Miranda Waiver, stating he understood his rights but would not sign anything. STRICKLAND was uncooperative and combative and stated that he knew the police did not have a case on him. He stated that he "did not take anyone's cases and would not give any cases" on anyone, so he would not tell reporting officers anything. STRICKLAND stated that he knew why the police had picked him up and knew all about the murders last night because when he heard about the shootings on the television, he knew that some friends lived in that area, so he went out on the streets to find out what had happened. He stated that he then saw two cops in a car at 55th and Jackson and these cops told him who had been killed and who had done it. When reporting officer asked STRICKLAND who had been killed, he stated "a dude named LARRY INGRAM and another dude named 'BROTHER', along with a girl." He was then asked who he had been told committed the killings, and he refused to answer.

Reporting officer then questioned STRICKLAND concerning his activities on 4-25-78 and he related the following. He stated that he was at his house all day watching TV and sleeping. He stated around 5:00 p.m., KELVIN LEWIS came by, riding his 10-speed bicycle. KELVIN wanted to borrow his brown windbreaker jacket because it was cool out. STRICKLAND stated that he gave LEWIS his jacket and KELVIN was going up to get his brother's car and come back. STRICKLAND stated that when LEWIS left, he went back inside his house with his brother, RODNEY, where they watched TV, waiting for LEWIS to come back which he never did. STRICKLAND further stated that he was not involved in any killing and would not talk about it. After further questioning, STRICKLAND stated that he knew the police knew that he was with the "killers" yesterday, but he didn't want to snitch. When reporting officers asked STRICKLAND when he was with the suspects, he replied, "I told you, 5:00 p.m."

REPORT APPROVED BY:

CRIM 100 (REV. 5-63)

After further questioning, STRICKLAND related the following. He stated that when LEWIS came over on his bicycle, three other dudes also came over. He stated that VINCENT BELL and KIM ATKINS also came over riding 10-speeds and a dude named PAUL HOLLIWAY was following them, driving KIM'S Oldsmobile. He stated that VINCENT and KIM stayed for only a few minutes and then they, along with PAUL, left and went down to VINCENT'S mother's house where they went in. STRICKLAND stated that he then went inside and LEWIS left. He also stated that LEWIS did not know BELL or ADKINS and he only knew him. STRICKLAND stated that he did not know PAUL very well and only knew that he lived somewhere around 43rd and College.

Reporting officers then asked STRICKLAND how he knew that the police were looking for the above people and he stated that a "padre" of his called him last night and told him. He stated that "the girl that was shot in the leg" called this padre of his from the hospital and she told him that she knew who had shot her and she was going to tell the police. He stated that his "padre" then called him and told him about it. STRICKLAND refused to name this "padre" and also refused to say what time this call was received by him. STRICKLAND then stated that around 9:00 a.m. this morning, he got a phone call from VINCENT and KIM who were together. They asked him if the police had been out after him and he told VINCENT that he was hot because the police were out at his mama's house. STRICKLAND stated that he did not ask them where they were and did not know.

STRICKLAND was then asked if he had ever touched any of KIM'S or VINCENT'S guns that would have his fingerprints on them, and after thinking for a few minutes, he stated that he might have touched VINCENT'S shotgun. He then related that about two days ago VINCENT'S car was run into by a "punk," and since this punk was afraid of VINCENT, he gave him a brand new 12-gauge pump shotgun with a normal length barrel, and some money to pay for the damage done to VINCENT'S car. He stated that this same day, which was Sunday or Monday, he was riding in VINCENT'S Chevrolet with VINCENT and KIM. VINCENT then pulled up in front of KIM'S house and VINCENT and KIM got out of the car. VINCENT then opened the trunk and KIM got the shotgun out of the trunk and carried it into his house. STRICKLAND then stated that later that day VINCENT came and asked him for some shotgun shells as VINCENT knew he had some. He stated he then gave VINCENT four or five shells which he described as being 12-gauge, green plastic shells, unknown shot number. He also stated that VINCENT and KIM had a lot of guns, as did he, and he handled "as many as I could." STRICKLAND refused to tell reporting officer when or where he had touched the shotgun he described.

Reporting officer then asked STRICKLAND if he knew any of the victims and he stated that he had known LARRY INGRAM before INGRAM went to the penitentiary, but since his release he has only seen him casually. He stated that he does not consider INGRAM a friend, and only knew him to say "Hi" on the street. STRICKLAND then stated that he had never been over to "the Crib" in which the victims were shot, but stated he knew it was a dope house from the word on the street. He stated that he did not know any of the other victims and had never talked to them. STRICKLAND then stated that he knew INGRAM was dealing in marijuana but knew nothing else about him. When reporting officer asked STRICKLAND if INGRAM carried a gun, he stated that everyone carries guns. STRICKLAND then asked reporting officer where the house was located that the victims were shot in, and when reporting officer pointed out to STRICKLAND that he had already related that when he heard the

address of the shootings on television, he became interested as he had frien[ds] in the area, STRICKLAND became very combative and stated that he had told th[e] police more than he wanted to and he wasn't talking any more. STRICKLAND then stated, "Book me or turn me loose, but if you do, next time you come after me, draw first or I'll kill you." STRICKLAND then stated that if he had gone with VINCENT on the "deal", he would have been shooting along with everyone else because, "I love to shoot my gun, I'm a good shot, and I love to kill people."

Reporting officer was then informed by Det. William Schweitzer that he had just talked to the #4 victim, CYNTHIA DOUGLAS. Ms. DOUGLAS stated that her family had been contacted by a "NORDY STRICKLAND" who told them to have her keep her mouth shut and he would pay her three hundred dollars to keep quiet. She further stated that after thinking about what had happened and putting everything together, that she believes NORDY STRICKLAND was the suspect who entered the house with the shotgun and that he was short, muscular, and was wearing big glasses. An appointment was then made for Ms. DOUGLAS to respond to the C. A. Persons Division at 4:00 p.m. for a lineup.

Reporting officer then informed STRICKLAND that he was under arrest and he was taken to Central Detention and booked by Officer Chambers.

Investigation to continue.

Det. David Barton

raf

STATE OF MISSOURI )
                        ) SS.
COUNTY OF COLE )

I, Kilm Atkins, being first duly sworn upon my oath, depose and state as follows:

1. I was a co-defendant with Kevin Strickland in a case arising in Jackson County concerning a multiple homicide. Mr. Strickland, Vincent Bell and myself were the defendants in the case.

2. Mr. Strickland went to trial prior to the disposition of the charges against me. Mr. Strickland was convicted of capital murder and sentenced to fifty years imprisonment in the Missouri Division of Corrections, without parole eligibility. Later, I entered a guilty plea to the charge.

3. Mr. Strickland was not involved in the homicides and I was willing to so testify at his trial; however, since charges were presently pending against me, I was unable to do so and would have had to take the Fifth Amendment had I been subpoenaed to testify. Since I no longer have pending criminal charges against me, I am now free to testify concerning the events which lead to both my conviction and to Mr. Strickland's conviction.

FURTHER AFFIANT SAITH NOT.

                                      */s/ Kim Atkins*
                                      KILM ATKINS

Subscribed and sworn to before me on this ____ day of _____, 1981.

                                      */s/ Fred W. Baker*
                                      Notary Public

My commission expires:

IN RE: State of Missouri, )
          Respondent, )
           )
           )
VS. )
           )
           )
Kevin B. Strickland, )
          Appellant, )

## AFFIDAVIT OF VINCENT BELL CR79-0355

I, _Vincent L. Bell_, hereby give the following affidavit and/or statements freely and truthfully.

(1) August 1979 I Vincent Bell entered a detailed confession plea to three (3) reduced charges of second degree murder of a crime 4-25-78 at 6934 South Benton Kansas City Missouri; (see State v. Bell CR79-0355).

(2) Each and every statement and/or answer to questions I gave was true and uncoached or coerced by any outside influence.

(3) Throughout my confession plea, I revealed the names of my three (3) true accomplices and repeatedly informed the court that Kevin Strickland was not involved in any aspect of the crime.

(4) Kevin Strickland went on trial prior to my confession plea; therefore, I could not testify and exonerate him without committing legal suicide on myself.

(5) After seeing Strickland convicted for a crime he did not commit or know anything about, I decided to enter a plea.

(6) Kevin Strickland is wrongly convicted and this is truly a miscarriage and/or manifest injustice.

(7) My confession pleas court accepted my detailed confession plea as true in its entirety, (no exceptions).

(8) Providing Kevin Strickland is given a new trial, I will truthfully testify on his behalf to the contents of this affidavit as well as my August 1979 confession plea.

_____
Affiant

Notary _____

J. HEATH CANTRELL
Notary Public - Notary Seal
State of Missouri
Commissioned for Texas County
My Commission Expires: September 13, 2014
Commission Number: 10938725

EX. "E"
2 OF 2 PGS

-(2)-



"Ken Blucker" &lt;Ken@TheMIP.org&gt;
02/09/2009 04:46 PM

To &lt;Cynthia.Richardson@courts.mo.gov&gt;
cc
bcc
Subject RE: Wrongfully charged

Dear Ms. Richardson:

Our Project's policies do not allow us to proceed on a matter unless we have received a request directly from the individual seeking our services. I suggest that, if this individual is making a claim of actual innocence, you have them write to us at the following address with a brief summary of their conviction and a request for our assistance:

Midwestern Innocence Project
6320 Brookside Plaza, #1500
Kansas City, MO 64113

Once we receive that, we will send the forms necessary for us to process their case.

We appreciate your concern and look forward to receiving the request. Please pass this information on to the individual. Best wishes in your quest for justice.

Ken Blucker
Staff Attorney
Midwestern Innocence Project

-----Original Message-----
From: Cynthia.Richardson@courts.mo.gov [mailto:Cynthia.Richardson@courts.mo.gov]
Sent: Wednesday, February 04, 2009 12:40 PM
To: office@InnocenceProjectMidwest.org
Subject: Wrongfully charged


I am seeking info on how to help someone that was wrongfully accused, this incident happened back in 1978, I was the only eyewitness and things were not clear back then, but now I know more and would like to help this person if I can.

Cynthia Richardson
Jackson County Family Court Services
Accounting Department
(816)435-4786 Fax (816)435-4793

Working With Families To Improve Our Future One Child At A Time
                    --Family Court Services--

EX. "F"